BAUSCH & LOMB
INCORPORATED, Plaintiff,

v.

William Terry SMITH, Sola Optical
USA, Inc., and Syntex
Ophthalmics, Inc., Defendants.

No. CIV–86–163T.

United States District Court,
W.D. New York.

March 11, 1986.

Nixon, Hargrave, Devans & Doyle (Michael Wolford, of counsel), Rochester, N.Y., for plaintiff.

Osborn, Reed, Van de Vate & Burke (Thomas Burke, of counsel), Rochester, N.Y., for defendants.

## DECISION and ORDER

TELESCA, District Judge.

In this action to enforce a non-competition agreement, this Court issued a tempo-

rary restraining order on February 25, 1986, based upon the application of the plaintiff, affidavits submitted by both parties, and oral argument of counsel. As part of my order, I directed that testimony be taken of Mr. Daniel Gill, Chief Executive Officer and President of Bausch & Lomb, Mr. Jay Holmes, Senior Vice-President of Bausch & Lomb, defendant William T. Smith, formerly Executive Vice-President of Bausch & Lomb, and now currently President of Syntex Ophthalmics, Inc., and Mr. Robert Palmisano, Vice-President-Human Resources of Bausch & Lomb, Inc. The testimony of Mr. Gill was taken on February 27th and 28th; the testimony of Mr. Jay Holmes and Mr. Smith and Mrs. Smith on March 4th and finally, the testimony of Mr. Robert Palmisano on Friday, March 7, 1986.

In reviewing this testimony, I have heard nothing that persuades me that the temporary restraining order previously issued on February 25th should be vacated. As an example, the defendants have attempted to substantiate their claim that plaintiff has committed an ERISA violation by forcing Mr. Smith to sign a noncompete agreement as a condition of receiving his severance pay package, unlike other executives who have left Bausch & Lomb under similar circumstances. To succeed in this position, defendants must show both (1) that an employee welfare benefit plan exists and (2) that Mr. Smith has been unfairly denied its benefits. At this stage of the case, and on the testimony and evidence presented to me thus far, defendants have failed to make such a showing.

An employee welfare benefit plan need not be in writing; it need only involve the existence of intended beneficiaries, intended benefits, a source of financing, and a procedure to apply for and collect benefits. *Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir.1979). In determining whether a plan exists, I must determine from the surrounding circumstances whether a reasonable person could ascertain the intended benefits, beneficiaries, source of financing and procedure for re-

ceiving benefits. *Id.*, at 1373. I have been unable to ascertain the existence of an unpublished plan as described by the defendants, from the evidence adduced in this case thus far.

The evidence did show that Bausch & Lomb does have a *published* plan for providing severance pay to its personnel, but the evidence indicates that Mr. Smith was not unfairly denied the benefits of this plan. The pertinent pages of that plan are attached to defendants' Memorandum of Law as Exhibit C. It provides for severance pay for employees who are *terminated.* Section 2.2 of that plan states specifically that:

> An employee who is offered *comparable* employment within the company and refuses such employment is ineligible for severance payments. (Emphasis mine).

Section 2.3 of Bausch & Lomb's proposed Executive Separation Plan (which Bausch & Lomb says it has never adopted) contains a similar exclusion for executives who refuse comparable employment. Although Mr. Smith does not consider the position he was offered at Bausch & Lomb to have been "comparable", he did admit on cross-examination that it would have been at the same salary, and that he would have continued as a member of the Board of Directors, and that he would have had the same title of Senior Vice-President. (Smith transcript 64–65). He stated that he did not consider the position comparable because it would have involved less responsibility and accordingly less prestige:

> because the dollar sales difference of the two businesses and the profitability of the two businesses was very different. The Personal Products Division may have been the most profitable division in the company, but the composite of my four divisions was certainly larger in sales and profits than the Personal Products Division by itself. *So I was giving up a great deal of stature. There is also a lot of stature in reporting to the Chairman of the Board rather than to someone else, regardless of what the*

*title is. That's very material.* (Transcript 66–67; emphasis added).

I cannot agree with Mr. Smith that the position was not comparable merely because it involved less prestige. The Executive Separation Plan he would have me enforce says specifically that a comparable position is one usually within one or two salary grades of an executive's current position and the same or similar functional area.[1] On the current state of the record, and at this stage of the case, it appears to me that Mr. Smith turned down a comparable position, and thus he was not entitled to severance benefits under Bausch & Lomb's published severance plan.

Mr. Smith also argues that there was an unpublished policy of paying one year's severance benefits to executives who left Bausch & Lomb under similar circumstances, and those executives were not required to sign non-compete agreements. There is inconclusive evidence before me at this time to conclude that this was an established Bausch & Lomb policy as claimed by Mr. Smith. He testified that it was "scuttlebutt" around the office that this was the Company policy, and he offered the affidavit of Donald Earhart who left Bausch & Lomb without having to sign a non-compete agreement, in support of his position. Mr. Earhart's affidavit stated clearly that he did not receive severance pay once he informed Bausch & Lomb that he was not going to sign the non-compete agreement. Mr. Palmisano testified that Bausch & Lomb did not have an unpublished Executive Severance Plan. In sum, there is very little proof that Bausch & Lomb *had* an unwritten Executive Severance Plan, and what little proof there is indicates that if Mr. Smith was treated any differently it was because he was treated *better,* than other executives leaving the company in similar circumstances. Palmisano's opinion was that Bausch & Lomb was very generous to Smith considering he had resigned. In fact this was the first severance package for an executive who had resigned that he can recall having been granted by Bausch & Lomb in his experience.

■ The defendant Smith also argues that he was in such a grossly unequal bargaining position in August of 1985 (having already tendered his resignation) that the non-compete agreement should be set aside for want of mutuality and unclean hands. Although there may have been a disparity in the bargaining strength of the parties, such disparity is common in contract negotiations; it was not so great as to warrant setting aside the non-compete agreement. By Smith's own testimony, he was able to extract some concessions from Bausch & Lomb during the negotiation process, limiting the agreement's restrictions to the work of the two divisions with which he was the most familiar. Also, there was testimony that both Mr. Holmes and Mr. Palmisano interceded on behalf of Mr. Smith when Mr. Gill allegedly lost his temper and demonstrated his unhappiness with Mr. Smith's decision to leave. Both Mr. Gill and Mr. Smith further testified that in later conversations Mr. Gill wanted Mr. Smith's departure to be on friendly terms. Mr. Smith characterized Mr. Gill as having stated, "Terry, we have been together too long for us to be in a situation where we can't meet on the street in the future and shake each other's hands, and so I want to make sure we part friends." (Smith transcript p. 28). This testimony does not describe a grossly unfair bargaining process.

Smith's argument that he was in an unequal bargaining position when forced to sign the non-compete agreement is further belied by the fact that he had already signed three separate agreements with Bausch & Lomb containing essentially the same promises. When he first joined Bausch & Lomb in 1979, Mr. Smith signed a General Security Agreement in which he agreed, among other things, not to disclose information relating to Soflens Contact Lenses to anyone for a period of two years

---

1. A similar definition of "comparable employment" is contained in Bausch & Lomb's published severance plan, at section 4.3.

after his employment with Bausch & Lomb. That Agreement is attached to plaintiff's complaint as Exhibit B. Exhibit A to the complaint is a Confidentiality Agreement signed by Mr. Smith on February 10, 1983 in which he agreed, among other things, not to disclose to anyone, at any time, any confidential and trade secret information of Bausch & Lomb, whether of a technical nature, of a business nature, or pertaining to future developments. Exhibit C to the complaint is an October 15, 1979 Invention Assignment Agreement from Mr. Smith to Bausch & Lomb, in which he agrees, among other things, not to disclose to anyone any secret or confidential information which he might acquire during his employment, for five years after his employment. Thus, Bausch & Lomb's inclusion of the non-compete clause in Mr. Smith's severance package hardly seems unfair; it appears to be a mere restatement of an obligation Mr. Smith already owed (and a less onerous restatement at that).

I reiterate my original conclusion when granting the temporary restraining order, and particularly on the record now before me after the testimony having been proffered by the parties, that Bausch & Lomb may have been generous to Mr. Smith in a situation when it did not have to be generous at all. I cannot find the alleged unfairness as claimed by the defendant which would warrant setting aside the agreement of August 30, 1985 containing the non-compete clause.

■ Defendants also argued that the agreement should be set aside because it is unduly restrictive in scope and duration. Insofar as the two year duration of the agreement, the cases cited by the plaintiff in its papers make clear that a two year restriction, in the absence of other undue restrictions, is reasonable. And insofar as the scope of the agreement, it restricts Mr. Smith from competing with the two Bausch & Lomb divisions where he had worked, and requires him to seek Bausch & Lomb approval before accepting employment with any company which has any division which competes with Bausch & Lomb. Mr.

Smith's argument that this is unduly restrictive is belied by Mr. Smith's other argument that he knows no trade secrets, but knows only the business skills he acquired at Bausch & Lomb and other companies. If his skills are that of a general businessman, a clause limiting his employment in Bausch & Lomb's *particular* business does not appear unduly restrictive. Therefore, I do not find, at this stage, any of these restrictions to be illegal.

The defendants finally argue that because so much of what Mr. Smith knows is publicly available to Bausch & Lomb's competitors, and because he will not breach his agreement not to disclose truly confidential Bausch & Lomb information, the plaintiff has failed to show it will be irreparably harmed by his continued employment with Syntex. I find that argument difficult to accept in view of the fact that Mr. Smith held the third highest executive position at Bausch & Lomb, having the corporate responsibility in the product area in which his new employer Syntex is a principal competitor. Add to that Mr. Smith's position as President of Syntex, and it is difficult to imagine that he will not avail himself of sensitive product strategies both as to development and marketing of which he knew as an executive at Bausch & Lomb and which can be of extreme value to Syntex. On the record before me, Bausch & Lomb has made the necessary showing of potential irreparable harm.

## CONCLUSION

Pursuant to F.R.Civ.P. 65, defendants in this action are hereby preliminarily enjoined from taking the following actions until the conclusion of the trial of this case or until August 30, 1987, whichever is earlier.

(A) Defendants Sola and Syntex and their officers and agents, are restrained and enjoined from
(1) employing defendant Smith, and
(2) soliciting or inducing defendant Smith to disclose Bausch & Lomb's trade secrets, confidential or proprietary information.

(B) Defendant Smith is restrained and enjoined from

(1) continuing employment with the defendant Sola or Syntex and

(2) using in any way or disclosing to any person Bausch & Lomb secret, confidential or proprietary information, including (but not limited to) information relating to research, design, production or sales of products designed, developed, manufactured or marketed by Bausch & Lomb.

The intent of this restraining provision concerning the defendant Smith's employment with the defendants Sola and Syntex is limited to defendant Smith's being employed in the areas which compete with Bausch & Lomb as defined in the non-compete agreement executed by Bausch & Lomb and the defendant, W. Terrence Smith on August 30, 1985.

The record before me amply demonstrates that Bausch & Lomb is likely to succeed on the merits of its claim that defendant Smith has violated the terms of the non-compete agreement he signed with Bausch & Lomb on August 30, 1985 and that Bausch & Lomb will suffer irreparable harm unless defendants are restrained as set forth above.

The bond in the principal amount of $250,000.00 posted by the plaintiffs pursuant to the order of this Court in support of the temporary restraining order granted by this Court will continue for the duration of this preliminary injunction.

ALL OF THE ABOVE IS SO ORDERED.