Stanley J. ZYDEL, Helmut Lehmann, Anthony Harasimowicz, Patrick McDonough, Robert L. Pawelski, Allen Noble, Ronald Hoier, John A. Filipski, Patricia A. Skretny, Angelo V. Romano, Sophie Eaton, as Executrix of the Estate of Gerald D. Eaton, John J. Closs, Frank Maciejewski, Plaintiffs,

v.

DRESSER INDUSTRIES, INC., Ingersoll–Rand Company, Dresser–Rand Company, Defendants.

No. Civ–88–399C.

United States District Court,
W.D. New York.

May 29, 1991.

Lippes, Kaminsky, Silverstein, Mathias & Wexler (Carol E. Heckman, and Mary Elizabeth Mattimore, of counsel), Buffalo, N.Y., for plaintiffs.

Maghran, McCarthy & Flynn (W. Donn McCarthy, of counsel), Buffalo, N.Y., for defendants.

## BACKGROUND

CURTIN, District Judge.

This action was brought in March, 1988, by thirteen former employees of Dresser–Rand Company to collect unpaid pension benefits allegedly due. Dresser–Rand and its predecessor companies owned and operated the Worthington Compressor Plant in Buffalo, New York. Each plaintiff began his or her employment at the plant as a union member, either with the United Steel Workers of America ("USWA") or the Office and Professional Employees International Union ("OPEIU"). Each plaintiff thereafter transferred to a non-union management position at the plant and asserts that he or she was led to believe that if management positions were ever abolished, the plaintiff could return to his or her union position without loss of benefits.

In late 1986 and early 1987, defendants notified plaintiffs that they were terminating plaintiffs' management positions and closing the plant. The first three plaintiffs to be so notified were foundry employees Allen Noble, Anthony Harasimowicz, and Angelo Romano. They claim they were told by William Netols, Director of Human Services at Worthington, that they were entitled, because of their seniority, to return to the union and collect a union pension at their option. *See* Item 60 (Noble affidavit). Mr. Netols categorically denies this. Item 67, ¶ 2 (Netols affidavit). Plaintiffs claim that after they were so notified, the company changed its position and refused to allow them to return to the union.

The remaining ten plaintiffs learned in early 1987 they would be laid off. Although union personnel continued to work at Worthington until mid-1987, Dresser–Rand refused to permit any plaintiff to return to his or her union position. Instead, most of the plaintiffs left on March 31, 1987, receiving a retirement package less favorable than they would have received had they been granted a union pension. Plaintiffs seek to recover retirement benefits equal to those paid to union members. Item 14 (Amended Complaint).

Plaintiffs have offered five theories to prove their entitlement to union pensions. First, plaintiffs argue that defendants' "policy and practice" of returning a management employee to his or her union position upon abolishment of that person's management position is an "employee benefit plan" under the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1002(3). Second, plaintiffs assert they are entitled to be returned to their positions under the state law doctrine of promissory estoppel. Third, plaintiffs claim they were "participants" in the union pension plan and are therefore entitled to benefits thereunder. Fourth, plaintiffs argue that defendants violated § 204(g) of ERISA, 29 U.S.C. § 1054(g), by decreasing or eliminating plaintiffs' accrued pension benefits. Finally, plaintiffs claim that defendants' attempt to amend the union plans in February, 1985, to cease crediting plaintiffs' years of service in the union pension

fund is null and void, as plaintiffs were not notified of any amendment.

Defendants argue that plaintiffs were not entitled to return to their union positions, that the company never promised such a return, and that plaintiffs ceased to participate in the union pension plan when they accepted promotions to management. Defendants have moved for summary judgment on these, and other, grounds. Plaintiffs oppose the motion.

## FACTS

As noted, the Worthington Compressor Plant was closed by defendants in 1987. Dresser Industries had purchased the plant from McGraw–Edison Company in early 1985. Dresser–Rand took over operation of the plant from January 1, 1987, until the plant closed later that year. Other corporate entities owned the plant between the time McGraw–Edison owned it, and the Worthington Corporation ("Worthington") built the plant.

The thirteen plaintiffs in this case were each hired by Worthington in the early 1950s or 1960s.[1] Each was hired into either the USWA or OPEIU union and became a participant in that union's pension plan with the company. Thereafter, each

[1] The thirteen plaintiffs' abbreviated work histories, in order as their names appear in the complaint, are as follows:

Stanley J. Zydel was hired by Worthington on July 15, 1953, as a Mill Helper. He became a member of the USWA at that time. On November 23, 1964, Mr. Zydel became an Inspector B with the OPEIU. On September 1, 1974, Mr. Zydel was promoted to the management position of Foreman—Inspection. He remained in management until his termination on March 31, 1987. While in management, he was promoted on May 1, 1975, to Industrial Relations Representative, and on August 1, 1981, to Manager, Safety and Security. Item 44 (Netols affidavit).

Helmut Lehmann was hired by Worthington on June 13, 1955, as an electrician in the USWA. On May 9, 1977, Mr. Lehmann was promoted to management as Foreman, Maintenance Services. Mr. Lehmann remained in management until August 31, 1987, at which time he was terminated. Item 47 (Netols affidavit).

Anthony Harasimowicz was hired by Worthington on August 13, 1956, as a Foundry Apprentice in the USWA. On January 21, 1957, he was promoted to Sand Technician in the OPEIU. On May 1, 1970, he was promoted to the management position of Cupola Foreman. Mr. Harasimowicz was promoted several times within management until, on April 1, 1987, he was transferred to the Dresser–Rand Turbo Products Division in Olean, New York, pursuant to his acceptance of the transfer on February 19, 1987. He worked at that facility until August 4, 1987, at which time he was terminated. Item 49 (Netols affidavit).

Patrick McDonough was hired by Worthington on January 23, 1950, as a Timekeeper. In 1951 he joined the OPEIU. In 1955 he became a participant in the OPEIU pension plan. In 1959 he was promoted to the management position of Billing Supervisor. He remained in management, receiving two promotions, until December 31, 1987, at which time he was terminated. Item 50 (Netols affidavit).

Robert L. Pawlewski was hired by Worthington on December 12, 1950, as a Trades Helper in the USWA. On March 16, 1970, Mr. Pawlewski was promoted to the management position of Night Foreman—Tool Room. Mr. Pawlewski remained in management, with at least one promotion, until June 30, 1987, at which time he was terminated. Item 45 (Netols affidavit).

Allen Noble was hired by Worthington on June 22, 1964, as a Foundry Locker Room Attendant with the USWA. On May 29, 1978, Mr. Noble was promoted to the management position of Foreman, Chip and Clean. On June 1, 1981, he was promoted within management to the position of General Foreman, Cleaning. On December 20, 1982, due to a reduction-in-force at the plant, Mr. Noble returned to the USWA. He returned again to management as a Foreman, Foundry, on September 26, 1983. He remained in this position until March 31, 1987, when he was terminated. Item 46 (Netols affidavit).

Ronald Hoier was hired by Worthington on August 13, 1951, as Open Order Stores Clerk with the OPEIU. On May 1, 1974, Mr. Hoier was promoted to management as Supervisor—Purchases. Mr. Hoier remained in management, receiving at least one promotion, until his termination on March 31, 1987. Item 51 (Netols affidavit).

John A. Filipski was hired by Worthington on July 9, 1951, as Machinist Apprentice with the USWA. On February 1, 1960, Mr. Filipski was promoted to management as Machine Shop Foreman. He remained in that position until his termination on July 31, 1987. Item 53 (Netols affidavit).

Patricia A. Skretny was hired by Worthington on May 10, 1954, as Steno Clerk # 1, with the OPEIU. She remained in that position until 1956, when she accepted a management (non-supervisory) position as Secretary to the Manager of Engineering. On May 26, 1969, her title became Executive Secretary, a position she held until her termination on March 31, 1987. Item 49 (Netols affidavit).

Angelo V. Romano was hired on July 3, 1951, as Foundry Apprentice in the USWA. On June 1, 1973, Mr. Romano took the management po-

plaintiff transferred into a non-union management position with the company. The earliest plaintiff to transfer was Patricia Skretny in 1956. The latest transferee was Allen Noble, who moved into management on May 29, 1978. Most transferred in the early 1970s. All except Mr. Noble remained in management until they were notified in late 1986 or early 1987 that the plant would be closed. All became eligible for, and have received, pension benefits from the company under the management pension plans.

## DISCUSSION

### I. STANDING: WERE PLAINTIFFS "PARTICIPANTS" IN EITHER UNION PENSION PLAN?

As an initial matter, the court must decide whether plaintiffs were "participants" in either the USWA or OPEIU pension plans under ERISA. If not, plaintiffs would lack standing to sue for benefits under these plans. 29 U.S.C. § 1132(a). *See also Tuvia Convalescent Center, Inc. v. National Union of Hosp. & Health Care Employees,* 717 F.2d 726, 729 (2d Cir.1983).

ERISA defines "participant" as "any employee or former employee of an employer ... who is *or may become eligible* to receive a benefit of any type from an employee benefit plan which covers employees of such employer...." 29 U.S.C. § 1002(7) (emphasis added). The Supreme Court, in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), has recently explained the scope of this definition.

In our view, the term "participant" is naturally read to mean either "employees in, or reasonably expected to be in, currently covered employment," *Saladino v. I.L.G.W.U. National Retirement Fund,* 754 F.2d 473, 476 (CA2 1985), or former employees who "have ... a reasonable expectation of returning to covered employment" or who have a "colorable claim" to vested benefits, *Kuntz v. Reese,* 785 F.2d 1410, 1411 (CA9) (*per curiam*), cert. denied, 479 U.S. 916 [107 S.Ct. 318, 93 L.Ed.2d 291] (1986).

*Bruch,* 489 U.S. at 117, 109 S.Ct. at 957–958.

■ At this point, the court need not decide whether plaintiffs were "employees in ... currently covered employment." [2] *Id.* (quoting *Saladino,* 754 F.2d at 476). For plaintiffs to have standing as participants, they need only have had a "reasonable expectation of returning to covered employment." *Id.* (quoting *Kuntz,* 785 F.2d at 1411).

■ Plaintiffs appear to have had a reasonable expectation of returning to their union positions. They have asserted an expectation; the question is whether it was

sition of Foundry Coreroom Foreman. He remained in management, receiving two promotions, until he was terminated on December 31, 1987. Item 55 (Netols affidavit).

Gerald D. Eaton was hired on June 29, 1955, as a Test Technician with the OPEIU. On December 1, 1964, Mr. Eaton was promoted to management as a Traffic Supervisor Inbound Material. He was promoted within management in 1970, and again in 1971. On November 1, 1974, he was transferred to a Studebaker-Worthington facility in Holyoke, Massachusetts. He remained there until his transfer back to Buffalo on June 1, 1976, when he was made Production Control Manager, Parts, at the Compressor Plant. He was again promoted twice within management before being terminated on March 31, 1987. Mr. Eaton has since died. Item 56 (Netols affidavit).

John J. Closs was hired on October 19, 1964, as a Specifications Clerk with the OPEIU. On June 1, 1972, he was promoted to the manage-

ment position of Supervisor, Parts Order Service. He was promoted within management several times before being reassigned and reclassified as Purchasing Agent, Marine and Government, on July 1, 1984. He remained in that position until his termination on March 31, 1987. Item 52 (Netols affidavit).

Frank Maceijewski was hired on December 19, 1956, as Engine Lathe Operator in the USWA. On March 5, 1962, he became an Inspector B with the OPEIU. He returned to the USWA as Turret Lathe Operator on April 19, 1962, but only until April 29, 1962, when he again joined the OPEIU as Inspector B. He joined management (non-supervisory) as Quality Control Analyst on January 1, 1966. He was again promoted within management until his termination on March 31, 1987. Item 54 (Netols affidavit).

2. This issue is addressed in section III of this opinion.

"reasonable." In support of their contentions, plaintiffs point to four pieces of evidence: (1) seniority provisions in the USWA and OPEIU collective bargaining agreements with the company, (2) the company's actual practice of permitting other employees to transfer back from management to union positions, (3) express promises made by the company to these plaintiffs permitting such transfer, and (4) the language of union pension plans permitting accumulation of union benefits for union members transferring to management prior to certain dates.

## A. Collective Bargaining Provisions

Plaintiffs first argue that they were entitled to return to their former union positions because, under language in the collective bargaining agreements between Dresser Industries ("Dresser") and the two unions, they continued to accumulate union seniority even after they were promoted to management. In the USWA contract, union seniority accumulated for employees upgraded to supervisory positions prior to August 15, 1974, while that employee remained in management. Item 69, Exh. 22, § 12.12. OPEIU employees upgraded to management prior to January 12, 1972, also accumulated union seniority. Item 69,

Exh. 23, § 14.14. Most plaintiffs qualified for accumulated seniority under these provisions.[3]

The question arises, however, whether these management employees were entitled to exert this accumulated seniority to return to union positions. Plaintiffs claim they were, quoting USWA contract § 12.01, which provided that

Seniority shall determine the right of an employee to work and shall be based on length of service as defined herein and shall only be qualified by the ability of the employee to perform available work with the Company.

Item 69, Exh. 22, § 12.01 (emphasis added). Defendants claim that the word "employee" in this phrase excluded plaintiffs, who were admittedly outside the bargaining unit. See Item 66 (Lardo affidavit). The contract, however, does not define "employee." Nor does it use the term to refer exclusively to hourly paid personnel. See, e.g., Item 69, Exh. 22, § 12.12. Moreover, plaintiffs have filed other evidence to indicate that, given their seniority, they were entitled to return to the union.[4]

## B. Prior Practice

Second, plaintiffs point to the practice of prior owners of the Worthington plant of

---

**3.** Several plaintiffs did not accumulate seniority under their union contracts, however. Of those who were members of the USWA, plaintiff Helmut Lehmann, promoted May 9, 1977, and Allen Noble, promoted May 29, 1978, did not accumulate seniority. In the OPEIU, those promoted between January 12, 1972, and August 16, 1983, who did not return to bargaining unit work within one year, had their union seniority cancelled. Id. This would include Stanley J. Zydel, promoted September 1, 1974, Ronald Hoier, promoted May 1, 1974, and John J. Closs, promoted June 1, 1972.

In addition, under § 14.14 of the OPEIU contract, "[i]f an employee accepted a transfer to any non-supervisory position outside of the bargaining unit prior to January 12, 1972, the employee's seniority shall stand as of the date of said transfer, but shall not accumulate." Item 69, Exh. 23, § 14.14. Patricia Skretny, who accepted a transfer to a non-supervisory secretarial position in 1956, had her union seniority frozen under this provision. Frank Maceijewski also accepted a transfer on January 1, 1966, to a non-supervisory management position. Mr. Maceijewski later accepted a supervisory

management position on January 1, 1968, however, so it is not clear what effect § 14.14 had on his seniority.

**4.** Defendants have filed numerous affidavits arguing that it was entirely within the company's prerogative to return these employees to the union. These affidavits appear quite persuasive. See, e.g., Item 66 (Lardo affidavit) (former union negotiator of collective bargaining agreement asserting that plaintiffs were without rights).

Plaintiffs, however, have some telling evidence of their own. See Item 60, Exhs. A, B. Exhibit A, a 1982 letter to plaintiff Allen Noble during a reduction-in-force at the plant, notes: "If you wish to return to the U.S.W.A., it appears that you have the seniority to do so. If you do choose this option, then the layoff benefits above are no longer available to you." Exhibit B, a November 25, 1986, interoffice memo of William Netols, Director of Human Resources, states: "A. Noble and A. Romano both have placement rights in the USWA. We have calculated their benefit if they returned to the unit and retired under a 70/80 pension."

permitting employees transferred from union to management to transfer back into the union at their request. Plaintiffs list twenty-four persons permitted to make such a move, including plaintiff Allen Noble in 1982–83. *See* Item 59, ¶ 21 (Zydel affidavit). Defendants argue that this might have been the practice of prior owners, but was not the practice of Dresser Industries or Dresser–Rand. Plaintiffs, however, have pointed out that at least one individual was transferred during Dresser's tenure. *See id.,* ¶ 23 (naming Christine Skowronski). Furthermore, defendant has not pointed to anyone other than plaintiffs who was *refused* transfer. This evidence, too, tends to underscore the reasonableness of plaintiffs' expectations.

### C. *Express Promises*

Plaintiffs' third argument is that they were promised the right to return to the union at their discretion whenever their management position was abolished. Defendants have filed extensive deposition excerpts which they argue show that no such promises were made. Plaintiffs have filed affidavits directly countering these arguments. *See, e.g.,* Items 59, 60. We must, of course, grant plaintiffs the benefit of all favorable inferences.

### D. *Pension Plan Provisions*

Finally, plaintiffs argue they were "participants" based on the union pension plans themselves. Item 70, Exhs. 26, 27.[5] Both plans define a "Participant" as "any Employee participating in the Plan in accordance with provisions of Section 3.01." Item 70, Exh. 26, § 1.24; Item 70, Exh. 27, § 1.30. An "Employee" is defined as a *person* who, on or after the Effective Date—February 16, 1985, the day Dresser Industries officially acquired the plant— has performed an hour of service for the company and is receiving remuneration for such service. *See* Item 70, Exh. 26,

§§ 1.16, 1.18; Item 70, Exh. 27, §§ 1.22, 1.24.[6] Section 3.01 provides:

> *Eligibility for Participation.* Any hourly-paid Employee who is a member of the bargaining unit represented by the Union and who is employed by the Employer's Worthington Compressor Division at Buffalo, New York, shall become a Participant immediately as of the Effective Date or, if later, as of his Employment Commencement Date.

> Further provided, the term Participant shall also include persons who, as of the Effective Date, were *participating* in the Predecessor Company Plan and whose seniority rights under the existing collective bargaining agreement have not terminated as of such date.

Item 70, Exhs. 26, 27, § 3.01 (emphasis added). Plaintiffs do not contend they fit under the first category of participation. The question is whether plaintiffs fit under the second category. This is a difficult question to sort out, as the prior union pension plans do not define "participating."

Plaintiffs argue that they were participating in the prior union plans because they were each at one time hourly employees covered by a union plan and, under Section V of those plans, did not incur a break in service in that plan upon their transfer from a union to management position within the company. *See* Item 69, Exhs. 24, 25, § V (Determination of Continuous Service). Defendants admit this. *See* Item 59, Exh. 4, at 165, 168 (Netols deposition). With no service break, a union employee who moved into a management position with the company would continue to accumulate service credit under the union plan during his or her time in management. Thus, if the employee ever returned to the union, his or her entire time with the company would be credited toward a union pension. Defendants also admit this, although they contend that this practice changed when Dresser acquired the plant.

---

**5.** The USWA and OPEIU plans, although not identical, are nearly identical.

**6.** Note that "employee" is *not* defined as it is in the prior union pension plan, as a person paid

on an hourly basis who is covered by the collective bargaining agreement. *See* Item 69, Exh. 24, § I(2).

*Id.* at 65–66.[7] Plaintiffs were "participating" in the prior union pension plans in the sense that they continued to accrue service time under those plans even while their time was spent in management.

Defendants have countered this argument with the affidavit of Bernard E. Hartt, a Consulting Actuary for Buck Consultants, Inc., the company that provided actuarial analysis of employee pension benefits for the various pension plans at the Worthington plant. Item 68. In order to perform the annual actuarial analysis on each plan, Buck Consultants would request and obtain a census-listing identifying the participants in each pension plan as of the first of the year. In the compilation provided January 1, 1985, just before Dresser acquired the plant, the thirteen plaintiffs are each listed as participants in the McGraw–Edison Company Buffalo Salaried Plan. *Id.,* Exh. 1. None of them is listed as a participant under the union plans. *Id.,* Exhs. 4, 5. It must also be pointed out that plaintiffs, as management employees, were not eligible to receive benefits under the McGraw–Edison union pension plans. All pension benefits, including the 70–80 pension benefits at issue in this case, were restricted in those plans to "employees." *See* Item 69, Exhs. 24, 25, § II. "Employees" were defined as hourly paid persons covered by the collective bargaining agreement. *Id.,* § I(2).

Based on this evidence, defendants would appear to have the best argument. However, there is another more compelling reason that plaintiffs' position has merit. If the second category of "Participant" in § 3.01 was meant only to include hourly paid personnel represented by the union, it would be superfluous. All union members are covered under the first category of § 3.01. Significantly, whereas the first category includes "[a]ny hourly-paid Employee," obviously excluding plaintiffs, the second category uses the encompassing word "persons." Item 70, Exhs. 26, 27, § 3.01. Moreover, the second category requires the "person" participating in the prior plans not to have had his or her seniority terminated under the existing collective bargaining agreement. *Id.* This requirement also appears to be designed to include plaintiffs. In both the USWA and OPEIU contracts, union seniority continued to accumulate and/or was frozen for union members who transferred to management before the early 1970s. *See supra* note 3 and accompanying text (discussing contract clauses and identifying plaintiffs who may not qualify under these clauses). As most plaintiffs were transferred prior to these cut-off dates, they would satisfy this criterion. Thus, if the second category of "Participant" in § 3.01 did not include plaintiffs, it is not clear whom this category *would* include.

Based on the collective bargaining agreements, prior practice, and alleged promises, the court concludes that plaintiffs' expectations of being returned to the union upon termination of their management positions were reasonable. The court finds the current pension plans to be ambiguous as to whether plaintiffs were "Participants" thereunder. Under the test set forth in *Bruch,* 489 U.S. at 117, 109 S.Ct. at 957, plaintiffs have standing to bring this suit.

## II. SUMMARY JUDGMENT

Defendants have moved for summary judgment. In order to prevail on their

7. During Mr. Netols' deposition, the following exchange took place:

Q. Now, are you saying that prior to February of 1985, if an individual was a union member and then worked in a non-union position and went back to the union, under the union plan, they would get full credit for their services as a non-union employee?

A. Prior to February of 1985, that's correct.

Q. And then after February of '85, they wouldn't get credit; is that what you're saying?

A. That's correct.

Q. They would get credit for—under the union plan just for the period of time that they were [a] union employee, and then credit under the management plan for the period of time they were [a] management employee?

A. That is correct.

Q. Would that be a simple way of summarizing the situation? And the outcome would be one check with both plans factored into that one check?

A. That is correct.

Item 59, Exh. 4, at 65–66 (Netols deposition).

motion, defendants must show "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one "that might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). "Uncertainty as to the true state of any material fact defeats the motion." *United States v. One Tintoretto Painting*, 691 F.2d 603, 606 (2d Cir.1982) (citation omitted).

## III. ENTITLEMENT TO PENSION BENEFITS

Although this court has held that plaintiffs had a "reasonable expectation" of returning to the union and obtaining a union pension, this fact does not *entitle* them to such pension benefits.

Plaintiffs have offered five arguments to prove their entitlement to benefits. Plaintiffs argue first that defendants' "policy and practice" of guaranteeing to former union members who accepted promotion to management positions the greater of union or management pension benefits upon retirement was an "employee benefit plan" under ERISA, 29 U.S.C. § 1002(3). Item 14, ¶¶ 7–22. Defendants argue that "policy and practice" cannot create such a plan, because, by ERISA's own language, an employee benefit plan must be established in writing. 29 U.S.C. § 1102(a)(1) ("Every employee benefit plan shall be established and maintained pursuant to a written instrument."). "[O]ral agreements or modifications to a pension plan are contrary to the express provisions of ERISA." *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1296 (5th Cir.1989). *See also Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir.1989);

*Lister v. Stark*, 890 F.2d 941, 946 (7th Cir.1989); *Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116, 120 (4th Cir.1989); *Musto v. American Gen. Group*, 861 F.2d 897, 909–10 (6th Cir.1988); *Straub v. Western Union Co.*, 851 F.2d 1262, 1265 (10th Cir. 1988); *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986). Plaintiffs counter by citing numerous cases for the proposition that an employee benefit plan need not be in writing. *See Gilbert v. Burlington Indus., Inc.*, 765 F.2d 320, 324–25 (2d Cir. 1985); *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir.1986); *Donovan v. Dillingham*, 688 F.2d 1367, 1372–73 (11th Cir. 1982); *Bausch & Lomb Inc. v. Smith*, 630 F.Supp. 262, 264 (W.D.N.Y.1986); *Molyneux v. Arthur Guinness & Sons*, 616 F.Supp. 240, 243 (S.D.N.Y.1985).

On first glance, these sets of cases would appear to be diametrically opposed to one another. The court in *Dillingham*, for example, held that "ERISA does not, however, require a formal, written plan." *Dillingham*, 688 F.2d at 1372. Instead,

> a "plan, fund, or program" under ERISA [29 U.S.C. § 1002(1)] is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.

*Id.* at 1373. The court explained the writing requirement.

> Once it is determined that ERISA covers a plan, the Act's fiduciary and reporting provisions do require the plan to be established pursuant to a written instrument ... but clearly these are only the responsibilities of administrators and fiduciaries of plans covered by ERISA and are not prerequisites to coverage under the Act.

*Id.* at 1372. In *Nachwalter*, however, the court faced the question of "whether written employee benefit plans governed by ERISA may be *modified* by oral agreements." *Nachwalter*, 805 F.2d at 959 (emphasis added). The court concluded they could not be because

if we permitted oral modifications of ERISA plans ... employees would be unable to rely on these plans [because] their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements. This problem would be exacerbated by the fact that these oral agreements often would be made many years before any attempt to enforce them.

*Id.* at 960.

The cases cited by plaintiffs and defendants are reconcilable because they apply to different situations. The cases cited by plaintiff, including *Dillingham,* address whether an "employee *welfare* benefit plan" can be created without a written instrument. 29 U.S.C. § 1002(1) (emphasis added). *See also Dillingham,* 688 F.2d at 1370–71. Welfare benefit plans include benefits for

> (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits ... or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (*other than pensions on retirement or death,* and insurance to provide such pensions).

29 U.S.C. § 1002(1) (emphasis added). Welfare benefits can even include severance benefits. *See, e.g., Gilbert,* 765 F.2d at 324–26; *Scott,* 754 F.2d at 1502–03. But welfare benefit plans do not include *pension* benefits, which are covered under a separate section. 29 U.S.C. § 1002(2). Each case cited by plaintiffs, with the exception of one unpublished decision, dealt with a claim for unpaid welfare benefits.[8]

■ In this case, plaintiffs clearly are asserting a claim for unpaid pension benefits, not welfare benefits. *See* Item 14. Pension plans covering members of the USWA and OPEIU have been in existence, *in writing,* since before each plaintiff joined the company. Thus, to the extent plaintiffs are unable to show, in writing, that they are entitled to benefits under these plans, their claim that the company's "policy and practice" established an entitlement to pension benefits is an assertion that these plans were modified *orally* to bring plaintiffs within the plans' ambit. Plaintiffs cannot maintain a cause of action for such an oral modification. *Cefalu,* 871 F.2d at 1296–97; *Nachwalter,* 805 F.2d at 960.

■ Nor can plaintiffs recover under their second theory: promissory estoppel. ERISA contains a very broad preemption provision, under which ERISA "supersede[s] any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan...." 29 U.S.C. § 1144(a) (emphasis added). This language has been granted broad scope by the Supreme Court. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 44–48, 107 S.Ct. 1549, 1551–1553, 95 L.Ed.2d 39 (1987); *Shaw v. Delta Air Lines,* 463 U.S. 85, 95–99, 103 S.Ct. 2890, 2898–2901, 77 L.Ed.2d 490 (1983). The Court in *Shaw* held that the phrase "relate[s] to" must be construed to mean that a state law is preempted "if it has a connection with or reference to such a plan." *Id.* at 97, 103 S.Ct. at 2900. *See also Gilbert,* 765 F.2d at 327. Plaintiffs' promissory estoppel claims clearly relate to the union pension plans in this case because plaintiffs seek to recover benefits under these plans. *Id.; Cefalu,* 871 F.2d at 1294. They are therefore preempted by ERISA.

Plaintiffs' third argument is that they were entitled to benefits under the terms of the union pension plans. Item 14. This

---

**8.** The unpublished decision, *Moore v. Cannelton Indus., Inc.,* 842 F.2d 1291 (4th Cir.1988), upheld a district court's decision to overturn a pension committee's ruling rejecting a union member's application for a pension. The court concluded that petitioner justifiably relied on oral promises by the company that he would receive credit toward retirement for his union employment, and that the company was estopped from denying these promises. The court distinguished *Nachwalter,* which prohibited oral modifications to pension plans on the basis that the promises made in that case were made after September 2, 1974, the enactment date for ERISA. *But see Degan,* 869 F.2d at 894 (holding that pre–1975 acts or omissions are not exempt from ERISA's requirements).

argument builds on the discussion under section I(D), *supra*. Plaintiffs are seeking 70–80 retirement benefits, which is a special pension established to cover plant shutdowns. Eligibility for these benefits is defined in § 4.04 of both the USWA and OPEIU plans. Item 70, Exhs. 26, 27, § 4.04. To be eligible, a "Participant" must have had at least ten years of "Participation Service" ("PS") and (1) have attained age 55 and whose combined age and years of PS shall equal 70 or more, or (2) whose combined age and years of PS shall equal 80 or more. In addition, the Participant must have incurred a "Severance from Service" by reason of a permanent shutdown of the plant. *Id.*

■ Under this definition, at least some plaintiffs would appear to qualify for benefits. As discussed in section I(D) of this opinion, it appears that most plaintiffs would fall under the second category of "Participant," as defined in § 3.01. They were "persons" who were "participating" in the "Predecessor Company Plan" at the time Dresser Industries purchased the plant who had not had their seniority rights terminated under the collective bargaining agreements then in force.[9] Item 70, Exhs. 26, 27, § 3.01. As "Participants," they would be entitled to 70–80 benefits if they met the requirements for "Participation Service." Participation Service means:

A. as to periods prior to the Effective Date, an Employee's accrued years of service and fractions thereof credited as of the Effective Date under the Predecessor Company Plan, plus

B. as to periods commencing on or after the Effective Date,

(i) for Participants with Participation Service credited under A above who have not had a Severance from Service Date as of the Effective Date, service measured beginning on the Effective Date. . . .

*Id.,* § 3.02. As noted above, participation service must combine with an applicant's age to equal 70 or 80 to be eligible for a 70–80 pension. *See id.,* § 4.04. On the facts currently before the court, this service requirement does not appear to prevent at least some plaintiffs from qualifying for 70–80 pensions.

Set against this language, each pension plan states on the first page that it is being published "for the benefit of certain employees" of Dresser Industries' Worthington Compressor Division "who are represented by" one of the two unions. *Id.,* at 1. Moreover, under the prior pension plans, there is no question that only hourly paid union personnel (or their spouses) were eligible for benefits. *See supra* § I(D).

■ Nevertheless, the court finds the language in the most recent union plans to be ambiguous on the question of whether plaintiffs are entitled to benefits thereunder.[10] Thus, there remains a genuine issue of fact precluding summary judgment against all but three plaintiffs. *See supra* note 9 (identifying plaintiffs who do not qualify for pension benefits under current union pension plans). Given this conclusion, the court need not address plaintiffs' further arguments against summary judgment. *See supra.*

---

9. As discussed in note 3, *supra,* three plaintiffs had their seniority in the union terminated under the OPEIU collective bargaining agreement: Stanley J. Zydel, Ronald Hoier, and John J. Closs. Accordingly, they do not qualify as "Participants" under § 3.01, and their claims are hereby dismissed.

10. There is additional evidence that plaintiffs are entitled to union pension benefits. Consider, for example, the deposition testimony of Theresa Schlabig, the benefits coordinator at Dresser who performed pension benefit calculations. She stated that there was a "grandfather clause as far as anyone who went from union to management. They had cut it off at a certain

year. If they were in prior to that year, well, then, they would still be eligible for that union pension at the time they retired." Item 59, Exh. 5, at 11. Ms. Schlabig also explained that in calculating pension benefits for those transferring prior to 1972 or 1974

I would calculate it first under the union plan, and then I would take the same and calculate it under the management plan, and offer both of these—whatever total I would come up with, both of these were offered to the employee, and of course, naturally, they would take the larger of the two.

*Id.* at 12.

Accordingly, defendants' motion for summary judgment is denied with respect to ten plaintiffs. Defendants' motion is granted with respect to plaintiffs Zydel, Hoier, and Closs. To frame a further order, counsel shall meet with the court on June 14, 1991, at 9 a.m.

So ordered.